# EXHIBIT B

THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| AL MADANY ISLAMIC CENTER OF NORWALK, INC., a Connecticut non-stock corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO: |
| v. | ) ) ) | 3:12-cv-00949 (MPS) |
| CITY OF NORWALK, CONNECTICUT, and CITY OF NORWALK ZONING COMMISSION, | ) ) ) ) | |
| Defendants, and | ) ) | |
| STONEGATE CONDOMINIUM ASSOCIATION, INC. | ) ) ) | |
| Intervenor-Defendants. | ) | |

**EXPERT REPORT OF MICHAEL GALANTE**

## Table of Contents

I.   Introduction ........................................................................................................... 3
II.  Qualifications ......................................................................................................... 3
III. Materials Considered ............................................................................................. 4
IV.  Opinions ................................................................................................................ 4
  A.  Previously Submitted Reports ........................................................................ 4
  B.  Opinions In Response to Stated Reasons for the Zoning Commission's Denial of Al Madany's Special Permit Application .................................................................... 5
V.   Trial Exhibits ......................................................................................................... 9
VI.  Compensation ........................................................................................................ 9
VII. Prior Testimony .................................................................................................... 10
Exhibit A
Exhibit B
Exhibit C
Exhibit D
Exhibit E
Exhibit F

ActiveUS 107573003v.5

I.   **Introduction**

1. I have been retained to provide expert testimony on behalf of Al Madany Islamic Center of Norwalk ("Al Madany") in the above-captioned matter.

2. I understand that Al Madany has filed suit against the City of Norwalk, Connecticut and the City of Norwalk Zoning Commission ("Zoning Commission") (collectively, "Defendants") and has alleged that the Zoning Commission's denial of Al Madany's special permit application is a violation of its federal and state law rights.

II.   **Qualifications**

3. I am a principal of the firm of Frederick P. Clark Associates, Inc., a land planning and traffic consultant firm located in Fairfield, Connecticut and Rye, New York. I am responsible for all traffic and parking planning studies prepared by the firm.

4. I received my Associate degree in Civil Engineering at Westchester Community College in Valhalla, New York in 1974. I studied Transportation Planning from 1974 until 1976 at Manhattan College in Riverdale, New York.

5. I have over 38 years of experience in land planning and transportation consulting. In the course of my work, I have performed analyses for over 860 planning proposals, including projects related to retail, office space, residential, golf courses, schools, fitness centers, conference centers, and courthouses. I provide continuing service to many towns, cities, and villages in New York and Connecticut.

6. I am a member of the Consultants Council of the Institute of Transportation Engineers and a member of the Intelligent Transportation Society of Connecticut.

7. I received the Design for Transportation Commendation for Design Excellence, jointly from the U.S. Department of Transportation and National Endowment of the Arts in October of 1981.

8. My curriculum vitae is attached as Exhibit A.

### III. Materials Considered

9. In arriving at my opinions in this matter, I have relied upon my education, experience, and knowledge based on literature in the field, and I have reviewed and considered materials and information relevant to this case. Such materials include the Site Plan for 127 Fillow Street presented by Al Madany, the Traffic Report, dated September 16, 2010, and prepared by H.K. Associates, and the Minutes from the June 6, 2012, Special Meeting of the City of Norwalk Zoning Commission ("Zoning Commission").

### IV. Opinions

#### A. Previously Submitted Reports

10. I incorporate by reference the entirety of my report dated March 2011 and all exhibits thereto, submitted to the Zoning Commission in connection with Al Madany's special permit application, and attached as Exhibit B.

11. I incorporate by reference the entirety of my report dated June 2011 and all exhibits thereto, submitted to the Zoning Commission in connection with Al Madany's special permit application, and attached as Exhibit C.

12. I incorporate by reference the entirety of my report dated December 2011 and all exhibits thereto, submitted to the Zoning Commission in connection with Al Madany's special permit application, and attached as Exhibit D.

13.     I incorporate by reference the entirety of my letter response dated April 4, 2012, presented to the Zoning Commission in connection with Al Madany's special permit application, and attached as Exhibit E.

14.     I incorporate by reference the entirety of my letter response dated April 9, 2012, presented to the Zoning Commission in connection with Al Madany's special permit application, and attached as Exhibit F.

### B.     Opinions In Response to Stated Reasons for the Zoning Commission's Denial of Al Madany's Special Permit Application

15.     I have reviewed the stated reasons issued by the Zoning Commission with regard to its denial of Al Madany's special permit application.

16.     Stated Reason No. 2 is: "The traffic report failed to identify any uses or analyze any uses of the rear building as required in the Special Permit application instructions and section 118-1450B of the regulations."

17.     This reason is incorrect.

18.     In my June 2011 and December 2011 Traffic Reports, the traffic analysis specifically addressed the levels of activity related to use of the Mosque for services and prayer services.

19.     The June 2011 report included an evaluation and/or analysis of the following:

   a. Daily Prayer - up to 25 people - 5 times a day (before dawn, 12:00 Noon, late afternoon, sunset, late evening);

   b. Friday Prayer Service - up to 100 people - 1:00 P.M. (midday hour volumes used in the analysis);

   c. Adult religious services - up to 20 people - Saturday and Sunday afternoon; and

    d. Eid Prayer - twice a year - up to 350 people (peak morning commuter hour and midday hour volumes used in the analysis).

20. The December 2011 report included an evaluation and/or analysis of the following:

    a. Daily Prayer - up to 25 people - 5 times a day (before dawn, 12:00 Noon, late afternoon, sunset, late evening);

    b. Friday Prayer Service - up to 100 people - 1:00 P.M.;

    c. Adult religious services - up to 20 people - Saturday and Sunday afternoon; and

    d. Eid Prayer - twice a year - up to 435 people (actual expected peak time periods for arrival and departure used in the analysis).

21. Based on an evaluation of each of the scheduled activities and prayer services, the following time periods were analyzed in detail:

    a. Weekday morning - 7:15 to 8:15 A.M.;

    b. Friday midday -11:30 A.M. to 12:30 P.M.;

    c. Friday afternoon - 1:00 to 2:00 P.M.; and

    d. Eid Service - twice a year - 9:00 to 10:00 A.M. for arrivals - 12:00 Noon to 1:00 P.M. for departures and 7:15 to 8:30 A.M. and 11:30 A.M. to 12:30 P.M. for arrivals).

22. Based on the results of the detailed analyses for the time periods for a variety of uses and arrival/departures of the facility, which included the mosque for prayer services, it was determined that if the area roads and the proposed access drive could accommodate site traffic with the largest attendance for services, the other time periods would not need to be analyzed in detail. Findings of the analyses indicated that area roads and the proposed access drive could

ActiveUS 107573003v.5

accommodate the traffic for Eid holiday services, which had the higher level of vehicular traffic estimated for the Mosque and the auxiliary uses.

23. It was also our understanding that when the Mosque was in full use the auxiliary facilities (to the rear of the building) would not be in use at the same time. Therefore, there was no need to perform this level of analysis for a condition that will not occur.

24. Stated Reason No. 9 is: "Due to inadequate parking as well as the bulk of the rear building and its ability to accommodate approximately 400 people seated around tables or 850 people seated in chairs we believe that the project will impact stable traffic flow. (118-1450C(1)(b).) The applicant submitted inadequate traffic analyses with this regard and we feel that the opposition's Traffic Engineer gave credible testimony as to adverse impact of traffic."

25. This reason is also incorrect.

26. It is unclear how the City determined that approximately 400 people could be seated around tables or 850 people could be seated in chairs at the proposed Mosque. The analyses provided to the City were based on standards and the estimate that up to 435 people could attend a prayer service, a fact which I obtained from the Applicant and which I understand was the basis of Al Madany's special permit application. It is understood that seats are not provided for prayer services; however, based on the City standards for the area for a person the 435 people number was determined and used in the traffic analysis. Again, the analysis is based on the maximum number of people anticipated at a prayer service for a holiday. The analyses were based on traffic volumes on adjacent roadways for both arrival and departures. Since this level of activity indicated that area roads and the proposed access drive could accommodate this level of traffic and operate at acceptable Levels of Service, it was determined that any lower number of attendees and use of the facility could be accommodated. As previously noted, it is

7

not the intention of the Applicant to have a prayer service or other activity of any size occurring at the same time that others are using the accessory rooms in the rear building. Therefore, it was unnecessary to provide such an analysis of a condition that would not occur.

27. The opposition Traffic Consultant indicated that the traffic analysis provided for the Applicant was inappropriate and that traffic data from another facility should have been used. It is the experience of this Firm that, when providing similar information to the City of Norwalk, the City typically will not accept any data from a location that is not either within the City of Norwalk or nearby. Providing traffic data for an Islamic Center located in Windsor, Connecticut, without identifying the number of members or families using the facility, locations of other nearby Islamic Centers is not a reliable methodology.

28. The Windsor location comprises 4,000 square feet for prayer services. It included a full-time school and parking for 219 vehicles. This parking is for those arriving for pray, as well as those attending school and including teachers and staff, as well as parents and students. By contrast, the Norwalk proposal comprises 2,950 square feet for prayer services and 87 parking spaces and there is no full time school proposed by the Applicant. The Windsor location is located near Interstate 91 and near large office parks, major employers and close to downtown Hartford. The Windsor mosque has easy access for thousands of people, while the Norwalk location is not convenient to any major highway and will serve only those nearby. The Windsor mosque was built to accommodate large groups and to accommodate all of the Hartford area, with prayer services and a school.

29. It is our opinion that simply conducting a traffic count at another facility and stating that this level of site traffic should be applied to Norwalk was inappropriate. These two facilities are not the same and do not attract the same levels of traffic or parking demand. Our

ActiveUS 107573003v.5

experience with any type of development in Norwalk is that the City would never have accepted this comparison to estimate site traffic.

30. The Applicant conducted actual traffic counts at the current facility in Norwalk on a Friday afternoon and applied this information to the analysis to determine potential impact, for example, during the Friday afternoon prayer service. This is a direct comparison of an existing facility for the same Congregation, which is appropriate.

31. It also should be noted that, in the estimates provided by the opposition's Traffic Consultant, it was unclear how a much higher number of vehicles would exit the comparison site after the prayer service than would arrive for the same service. It appears that other activities were occurring at the facility in Windsor, which were never explained to the Norwalk Commission to my knowledge.

## V. Trial Exhibits

32. I may rely on visual aids and demonstrative exhibits that demonstrate the bases of my opinions. Examples of these visual aids and demonstrative exhibits may include, for example, excerpts from studies or tests, interrogatory responses, deposition testimony, and deposition exhibits, as well as physical exhibits, charts, photographs, diagrams, videos, and animated or computer-generated graphics.

## VI. Compensation

33. I am being compensated at a rate of $245 per hour plus expenses for my time in this case.

## VII. Prior Testimony

34. I have testified as an expert at trial in a legal proceeding in the past four years. The testimony was at a trial in October 2010 on behalf of the town of Newtown, Connecticut, for the Connecticut state court action *Town of Newtown vs. Renata Adler*.

35. I declare under penalty of perjury that the foregoing is true and correct to the best of my own personal knowledge.

Sworn to on: April 1, 2013

_____
Michael Galante

ActiveUS 107573003v.5